**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Civil Case No. 1:18-cv-24988-FAM

|  |  |
|---|---|
| SANTIAGO PADILLA and MURRAY L. SHAMES, individually and on behalf of all others similarly situated, | **CLASS ACTION** |
| Plaintiffs, | |
| v. | |
| PORSCHE CARS NORTH AMERICA, INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Santiago Padilla and Murray L. Shames ("Plaintiffs"), by and through their undersigned counsel, bring this action against Defendant Porsche Cars North America, Inc. ("Porsche" or "Defendant"), on behalf of themselves and a nationwide class of all current or former owners and/or lessees of model year 2010 through 2016 Porsche Panamera vehicles equipped with V8 gasoline engines (the "Panamera Vehicles"), and model year 2011 through 2019 Porsche Cayenne vehicles equipped with V8 gasoline engines (the "Cayenne Vehicles") (collectively, the "Defective Vehicles"). Upon personal knowledge of the facts pertaining to themselves and on information and belief as to all other matters, Plaintiffs allege as follows:

## NATURE OF THE CASE

1.      This action is brought to address a persistent safety-related defect in the design and manufacture of the engine cooling system components in Panamera Vehicles and Cayenne Vehicles, including the use of adhesive to secure the slip-fit connection that joins the coolant pipes to the body of the thermostat housing unit assembly (the "Cooling System Defect"). The engine cooling systems in the Defective Vehicles are materially the same and the Cooling System Defect exists in all Defective Vehicles, regardless of driving conditions or compliance with Defendant's recommended maintenance schedule.

2.      Automobile engines run at very high temperatures. The engine cooling system is critical to normal and safe operation of a vehicle as it allows the engine to operate properly without overheating. Under ordinary operation, the coolant pipes repeatedly heat and cool, expanding and contracting with each "heat cycle." Normal operation also exposes engine cooling systems to extreme temperatures and road and engine vibration. Over time, the epoxy adhesive degrades, loosens, and eventually fails, causing the coolant pipes to suddenly separate from the thermostat housing.

3.      The Cooling System Defect presents a substantial safety risk because it can cause sudden engine failure and complete loss of vehicle power at any time and without warning, including while traveling at highway speeds. Moreover, when a coolant pipe separates from the thermostat housing, it separates completely, dumping a significant amount of coolant liquid throughout the engine compartment, onto the tires of the vehicles, and into the roadway. This creates an exceptionally dangerous and slippery road condition, leaving the driver of the Defective Vehicle and those traveling behind at risk of losing traction and control.

---

00152255

4.      When the Cooling System Defect causes the thermostat housing unit assembly to separate, costly repairs are necessary to restore the Defective Vehicles to useable condition because a mechanic must remove multiple engine components to access and replace the failed parts. In addition, the sudden separation of the coolant pipe causes highly pressurized coolant to spray in the engine compartment, causing additional damage to the engine compartment and engine components. Because the Cooling System Defect may manifest outside Porsche's warranty period, owners are forced to pay thousands of dollars to repair damage caused by the defect Defendant knows is likely to occur and to incur towing costs. Moreover, because the replacement parts suffer from the same design and manufacturing defects as the failed original, the Cooling System Defect may manifest itself multiple times throughout the life of the Defective Vehicle.

5.      Consumers rely on automakers, such as Defendant, to promptly inform them and initiate a remedy or countermeasure when the automaker discovers a vehicle model contains a defect, especially one that is present in multiple models and model years, and that puts the safety of the drivers, their passengers, and other drivers at risk.

6.      Porsche has known for more than a decade of the Cooling System Defect. Since at least 2007, various sources have put Porsche on notice that using epoxy adhesive to secure the coolant pipes to the body of the thermostat housing unit is a design defect, including: (1) Porsche's internal records of customer complaints; (2) dealership records; (3) records from and complaints to the National Highway Traffic Safety Administration; (4) warranty and post-warranty claims; and (5) and reports and claims relating to a similar design and defect in model year 2001 through 2007 Porsche 996 and 997 Turbo, GT3, GT3RS, GT2, and GT2RS vehicles. Despite such knowledge, Porsche has never taken steps to inform the Class, accept responsibility for repairs to Defective Vehicles, or initiate a remedy for the Cooling System Defect. Instead, Porsche has actively concealed that there is an ongoing defect by publicly claiming in 2014 that the defect was fixed with a change in the manufacturing process, failing to admit there is a defect when questioned by customers, and continuing to advertise the Defective Vehicles as being safe and of a particular high-end quality.

7.      The Defective Vehicles are sold on the promise that they are high-end performance vehicles, engineered and manufactured using cutting edge technology and materials, "advanced engineering, rigid quality control and demanding inspections." Porsche

FIRST AMENDED CLASS ACTION COMPLAINT

2

promises the Defective Vehicles are safe for their intended use, "handl[ing] the daily commute as supremely as [they] do[] the Corkscrew at Laguna Seca." Yet, contrary to these promises and the reasonable consumer expectations of Plaintiffs and the Class, Porsche uses an unreliable adhesive to secure slip-fit attachments between engine components that are exposed to high-pressure, extreme temperatures, and constant road vibrations. Porsche has long-known of and widely used superior methods to secure pipes and fittings that encounter such extreme stress. Yet, Porsche has failed to implement these alternative, safer designs in the Defective Vehicles, leaving Plaintiffs and the Class to bear the risks of the Cooling System Defect that Porsche created.

8.      Plaintiffs and the Class purchased and leased Defective Vehicles that are of a lesser standard, grade, value, and quality than represented; and they did not receive vehicles that met the ordinary and reasonable consumer expectations regarding safe and reliable vehicle operation.

9.      Despite its knowledge of the ongoing defect, its safety risks and the high repair costs associated with its, Porsche has not warned purchasers of the defect or instructed drivers on how to handle a sudden loss of coolant resulting from the defect. Instead, Porsche has actively concealed the defect. Porsche has failed to disclose the existence of this defect to Plaintiffs, the other Class Members, and the public, and has failed to inspect and repair the Defective Vehicles, or to reimburse Plaintiffs and the other Class Members for costs incurred to identify and repair this defect.

10.     Plaintiffs, on their own behalf and all others similarly situated and the general public, seek damages and equitable relief, including restitution and injunctive relief.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) many of the proposed Class Members are citizens of states that are diverse from Porsche's citizenship; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

12.     Venue is proper in this judicial District under 28 U.S.C. § 1391(a) because a substantial part of the challenged conduct or omissions giving rise to claims occurred and/or

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

emanated from this District and Porsche has caused harm to the Class Members residing in this District.

## PARTIES

13.     Plaintiff Santiago Padilla is a resident of Aventura, Florida in Miami-Dade County. In 2013, Plaintiff Padilla purchased a model year 2011 Porsche Panamera, equipped with a V8 engine, from The Collection Porsche dealership in Miami, Florida. In 2014, the Panamera suddenly overheated while driving. Plaintiff Padilla had the Panamera towed to The Collection where it was confirmed the coolant pipes had separated from the body of the thermostat housing unit due to failure of the epoxy adhesive. The Collection, which is an authorized Porsche dealership and repair facility, did not tell him at the time of sale or when he brought in the vehicle for repair that the problem with the cooling system of his Panamera was due to a defect in the vehicle, even though it and Porsche knew the truth. As a result, Plaintiff Padilla was forced to pay approximately $2,500 to The Collection to repair the Panamera. Plaintiff Padilla purchased his Porsche Panamera reasonably believing it was safe and of a particular quality based on Porsche's advertising of its vehicles. He lost money and property as a result of Porsche's conduct. He would not have purchased his Porsche Panamera if he knew it contained a Cooling System Defect that could render the vehicle unsafe during normal use.

14.     Plaintiff Murray L. Shames is a resident of Hillsborough County, Florida. In July 2014, Plaintiff Shames purchased a 2011 Cayenne S, equipped with a V8 engine from Carmax in Tampa, Florida. At the time of purchase, the Cayenne S had approximately 20,000 miles on the odometer. Plaintiff Shames had his Cayenne S inspected and regularly serviced at Reeves Porsche in Tampa, Florida. At no time did Reeves Porsche, which is an authorized Porsche dealership and repair facility, inform Plaintiff Shames that his Cayenne S had a defect in the cooling system, even though it and Porsche knew the truth. In or about April 2016, when his Cayenne S had approximately 37,000 miles on the odometer, the Cooling System Defect manifested, causing the coolant pipes to separate from the body of the thermostat housing unit. Plaintiff Shames paid a local repair shop $1,973.41 to repair the resulting coolant leak. Seventeen months later, in September 2017, Plaintiff Shames was traveling from Tampa to Orlando with his wife and children in his Cayenne, when the vehicle again suddenly overheated, spewing steam from the engine compartment. Plaintiff Shames had to immediately pull over, leaving him and his family stranded on the side of the highway until his Cayenne S could be

towed back to Tampa for the necessary repairs. A subsequent inspection revealed that the coolant pipe had again separated from the body of the thermostat housing due to the failure of the epoxy adhesive. Plaintiff Shames paid the local repair shop $400.71 to diagnose the problem. Reeves Porsche also conducted an inspection of the vehicle and estimated the necessary repairs at about $3,500. At no time did Reeves Porsche tell Plaintiff Shames that the reoccurring problem with the cooling system was due to a defect in the vehicle. Plaintiff Shames contacted Porsche regarding the cooling system problem and demanded Porsche pay for the repairs to the Cayenne S since this was the second time it happened. Porsche simply directed Plaintiff Shames to make a request for financial assistance to the service manager of Reeves Porsche. Porsche never informed Plaintiff Shames that the cooling system problem was due to a defect in his Cayenne S. After financial assistance was denied, in May 2018, Plaintiff Shames again contacted Porsche in writing informing Porsche of the repeat problem with the cooling system and informing Porsche that he had learned through internet research that this appeared to be a common problem with Porsche's vehicles. Plaintiff Shames stated, "it appears this is a common failure due to the fact that the hose is glued to the engine." Porsche responded by again refusing to cover the costs because the vehicle was outside Porsche's standard warranty. Despite Plaintiff Shames' inquiry regarding whether this was due to a common defect, Porsche never informed Shames that there was in fact a defect. Rather than repair the thermostat housing unit assembly a second time, Plaintiff Shames traded in his Cayenne S at a loss. Plaintiff Shames purchased his Porsche Cayenne S believing it was safe to drive and of a particular quality based on Porsche's advertising of its vehicles. He lost money and property as a result of Porsche's conduct. He would not have purchased his Cayenne S if he knew it a Cooling System Defect that could render the vehicle unsafe during normal use.

15.     Defendant Porsche Cars North America, Inc. is incorporated in the State of Delaware and is headquartered in Atlanta, Georgia. Porsche, as the exclusive importer and distributor of Porsche vehicles for the United States, sold, marketed, distributed, and serviced the Defective Vehicles.

00152255

## FACTUAL BACKGROUND

### *Porsche's Use of Epoxy Adhesive on Slip-Fit Is a Design and Manufacturing Defect, Rendering the Defective Vehicles Unreliable and Unsafe*

16.     Porsche vehicles are high-end performance vehicles. The Defective Vehicles at issue all contain upgraded performance packages and a V8 engine, including the S, 4, 4S, GTS, Turbo, Turbo WLS, and Turbo S models. Purchased new, the retail price for the Defective Vehicles begins at $45,500 for the Cayenne Vehicles, and $89,900 for the Panamera Vehicles.

17.     Porsche knows purchasers of its vehicles reasonably expect a safe and quality vehicle. In its advertisements, including advertisements for the Defective Vehicles, Porsche uses the tagline, "Porsche, There Is No Substitute." Porsche also represents in the owner's manuals for the Defective Vehicles that "[a] lot has gone into the manufacture of your Porsche, including advanced engineering, rigid quality control and demanding inspections."

18.     Despite their significant price tag and Porsche's representations regarding the quality of the Defective Vehicles, the Defective Vehicles were designed and manufactured with a defective coolant pipe attachment in the thermostat housing assembly unit that can suddenly separate while driving, causing significant damage and rendering the vehicles unsafe.

Porsche uses epoxy adhesive to attach the coolant pipes directly to the body of the thermostat housing. This is known as "slip-fit," because an end of a pipe is coated with epoxy and inserted, or slipped, into another component. A diagram of the thermostat assembly in the Defective Vehicles, including the thermostat housing and coolant pipes connecting to the thermostat housing are pictured below:

00152255



19.     The coolant pipe at issue, is the upper pipe connecting to the thermostat housing.

20.     A vehicle's cooling system is critical to keeping the vehicle operational and safe to use. When working properly, the engine coolant system keeps the vehicle from overheating while in use by sending a liquid coolant through the engine to pick up heat. The heated fluid then travels through pipes or hoses to the radiator where the hot liquid is cooled. Once the liquid is cooled it returns to the engine to pick up more heat. A thermostat is placed between the engine and radiator to monitor and regulate the temperature of the coolant liquid. A water pump ensures that this cycle is continuous while the vehicle is in use.

21.     If the coolant system fails, the vehicle must be immediately turned off. If the vehicle remains in use without a working coolant system, the engine temperature will quickly rise and in a matter of minutes, an overheated engine can be rendered useless.

22.     Every time the Defective Vehicles are driven, and the engines turned on and off, their cooling systems are heated significantly and then cooled. Over time, with repeated heating and cooling or "heat cycles," and compounded by constant road and engine vibrations while the vehicle is running, the epoxy adhesive used to connect the coolant pipes to the thermostat housing body degrades, softens and loosens. Eventually, the coolant pipes detach as a result of the Cooling System Defect.

23.     When the coolant pipes separate, there is a rapid loss of coolant into the engine compartment of the Defective Vehicles and the engine overheats. Eventually, the engine turns off, rendering the vehicles immobile, unsafe to drive and a hazard on the roadways.

00152255

24.     The thermostat assemblies on the Defective Vehicles are materially the same for purposes of this lawsuit because they use the same defective epoxy design to join the coolant pipes od the body of the thermostat housing.

25.     There is no warning to drivers of the Defective Vehicle as to when the epoxy adhesive will fail. As the adhesive connecting the coolant pipes begins to degrade and fail, it cannot be detected through a visual inspection because the epoxied part of the coolant pipes sits inside the thermostat housing, and the thermostat itself is blocked from view by the intake manifold. There is also no reinforcement on the pipe or the thermostat housing to prevent complete separation when the adhesive fails. The first visible sign of failure is the rapid release of coolant fluid when the pipe separates from the housing while the vehicle is in use.

26.     When the thermostat assembly fails, the repairs are significant and costly. After a sudden coolant dump, the separated coolant pipe cannot be reattached. At a minimum, the vehicle's water pump and thermostat assembly must be replaced. The coolant also often dumps on other critical components such as the starter and alternator, which then need to be replaced. In exceptionally violent failures, other electrical components and radiator(s) may be damaged. These repairs cost the owner thousands of dollars. Additionally, any do-it-yourself repair voids any existing warranties on the Defective Vehicles.

27.     The separation of the coolant pipes in the Defective Vehicles is unrelated to and separate from normal wear and tear.

28.     Although Porsche covers the cost of repair when a failure occurs inside the warranty period, the failures most often occur just outside the warranty period, leaving the significant cost of repair to the owners and lessees of the Defective Vehicles.

### Porsche Knew of the Defect Before Manufacturing the Defective Vehicles but Failed to Inform and Protect Consumers and Instead Publicly Claimed the Problem Had Been Fixed

29.     In large part because of prior internal investigations, investigations by the Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration, and thousands of complaints regarding Porsche's use of epoxy on certain slip-fit attachments, Porsche has been aware for many years that epoxy adhesive is insufficient to adjoin certain engine coolant system components.

---

30.     Porsche has used adhesive epoxy on the engine coolant system in its 2001-2007 996 and 997 models, including the 911 Turbo, GT3, GT3RS, GT2, and GT2RS models.[1] These vehicles suffered the same fate as the Defective Vehicles: sudden separation of the coolant pipes from the thermostat housing body due to failure of the epoxy adhesive.

31.     On April 26, 2013, the ODI opened an investigation into complaints of sudden, high volume coolant leakage in model years 2001-2007 Porsche 911's. According to the ODI, "[t]he complaints alleged that pipe ends joined by epoxy to certain coolant system components may fail suddenly and separate, resulting in large volumes of coolant leakage."[2]

32.     In response to the ODI investigation, "Porsche identified a manufacturing quality issue with the supplier's application of adhesive to coolant pipe fittings that resulted in elevated failure rates in approximately 6,800 early production Porsche 997 vehicles."[3] The ODI determined, based on sales data provided by Porsche, that the coolant pipe fittings at the water neck assembly were at issue. Importantly, Porsche admitted in its filings with the ODI that it "did not conduct specific durability testing of the adhesive bonds used in the coolant pipe fittings."[4]

33.     As part of the ODI investigation, Porsche admitted that in 2007 – well before it designed and manufactured the Defective Vehicles – that it conducted an internal investigation into reported epoxy adhesive failures on coolant pipe fittings located at the "water neck" of the water pump housing in its 997 vehicles.

34.     In connection with the ODI investigation, Porsche incorrectly told consumers that the Cooling System Defect was fixed. Porsche claimed that it "identified the cause as inadequate application of the adhesive." It represented to the ODI and the public, that as a result of Porsche's internal investigation, in late January 2008, Porsche's supplier "introduced an automated metering device for application of adhesive on pipe adapters" that fixed the problem.[5]

---

[1]     Internally, Porsche refers to all 911 models manufactured between 1997 and 2004 as the "Porsche 996" models, and those manufactured between 2004 and 2012 as the "Porsche 997" models.

[2]     U.S. Department of Transportation, National Highway Traffic Safety Administration, ODI Resume, PE 13-009.

[3]     *Id.*

[4]     *Id.*

[5]     *Id.*

35.     Porsche also represented to the ODI that even though there had been a problem, it did not pose a safety risk. The engine coolant system, including the water neck, in the Porsche 997 vehicles is located in the engine compartment, in the rear of the vehicle. According to Porsche, "the rate of leakage from a disconnected water neck pipe [was] limited by a plastic clamp which limits the displacement of the pipe to a few millimeters."[6] As a result, "[i]n Porsche's assessment, [] the coolant would immediately expand and evaporate....."[7]

36.     The ODI noted that in Porsche's assessment, because of the location of the engine coolant system in the rear of the Porsche 997 vehicles and the minimal coolant that could leak from the water neck pipe due to the plastic clamp, "Porsche does not believe that this is likely to result in a loss of traction or control to the incident vehicle or following traffic."[8]

37.     As a result, the ODI did not identify a safety-related defect in the Porsche 997 vehicles. However, in closing its investigation on March 10, 2014, the ODI stated that although "[a] safety-related defect had not been identified at this time, [t]he closing of this investigation does not constitute a finding by NHTSA that a safety-related defect does not exist."[9]

38.     Despite Porsche's public representations in the ODI investigation that Porsche had fixed the Cooling System Defect in the Porsche 997 vehicles by implementing an automated process for applying the epoxy adhesive to the coolant pipes, the epoxy adhesive on certain slip-fit attachments in the Defective Vehicles' engine coolant system continues to fail. Porsche has never acknowledged that the Cooling System Defect in fact still exists.

39.     Additionally, unlike the Porsche 997 vehicles, the engine and the engine coolant system in the Defective Vehicles are located in the front of the vehicle. As such, the engine coolant system in the Defective Vehicles is exposed to different rates of road and internal component vibration than the Porsche 997 models; the layout, size, and design of engine, drivetrain, steering, and cooling system components is different in the Defective Vehicles; and the coolant pipes in the Defective Vehicles are not reinforced with a plastic clamp at their connection to the thermostat housing. This makes the Cooling System Defect in the Defective Vehicles a safety issue. When the coolant pipe disconnects from the thermostat housing while

---

[6]     *Id.*

[7]     *Id.*

[8]     *Id.*

[9]     *Id.*

the Defective Vehicles are in use, the pipe completely separates, dumping a significant amount of coolant liquid through the engine compartment and onto the tires of the vehicles and the roadway. This results in a significant safety risk for both the driver of the Defective Vehicle and those traveling behind.

40.     Subsequent to the ODI investigation, there have been widespread complaints reported online about the dangerous Cooling System Defect in Panamera Vehicles and Cayenne Vehicles, indicating that Porsche's claimed fix of the problem in January 2008 was not in fact a fix. For example, the following complaints were found on various online forums:

- December 8, 2016: An owner of a model year 2013 Porsche Cayenne S stated: "While my wife was driving on a highway the coolant hose completely separated from the housing causing the car to rapidly overheat without warning. Excessive smoke forced my wife to pull over and to exit the vehicle with 2 small children in an unsafe area of the highway. A Porsche service facility diagnosed the vehicle and replaced the component at a cost of $5,343.56. The vehicle was 4.5 years old at the time of the repair."[10]

- July 1, 2013: "I just had the same failure…The coolant tube that connects the thermostat housiing [sic] to the upper radiator hose just popped out from the thermostat housing and dropped about 2 qts of coolant. The tube is fastened with epoxy that apparently can fail after repeated heat/cool cycles. The epoxy applicable was visibly insufficient with uneven coverage."[11]

- 2017: "We have the V8 Cayenne S from 2012, about 40k miles….When something breaks it is not trivial. Recently our 2012 Cayenne experienced a COOLANT LEAK due to the ENDEMIC PORSCHE COOLANT PIPE ATTACHMENT DESIGN…Our Cayenne cooling tube connecting the 2 halves of the engine came loose, and all the coolant escaped the car in less than 30 seconds. Luckily we were on surface streets, and after flat-bedding the SUV 30 miles to the nearest dealer, the cost to repair was $5,500."[12]

- July 20, 2013: "Was picking up my parents from the airport in my 20k miles Panamera 4s and the red engine warning overheat started to flash. Then, coolant gauge defective flashed yellow. Then, overheat. Back and forth - temp meter pegged to red overheat, then off, then pegged to red. Seemed to lose power but was still going, hard to know if a sensor problem or overheat. Being on the freeway in bumper to bumper had to drive at least a bit to find a safe spot with a shoulder. Was towed to the dealer via 1800Porsche and they

---

[10]     http://www.carproblemzoo.com/porsche/cayenne/coolant-leaking-problems.php     (last visited June 12, 2019).

[11]     https://www.6speedonline.com/forums/panamera/274908-2011-panamera-turbo-nightmare-anyone-else-having-issues-model-2.html (last visited June 12, 2019).

[12]     https://www.cargurus.com/Cars/Discussion-t9673_ds705764 (last visited June 12, 2019).

mentioned some two part tube connecting A to B that was changed to a single piece that can no longer blow. Mine blew up."[13]

- July 20, 2013: "I had the same issue with my 2011 Panamera S...The hose/tube connection blew out of the engine block. Its [sic] a metal tube connecting coolant hose to engine block.. [sic] The epoxy or sealant fails and the tube blows out.. [sic] Got the warning lights and bells and whistles about stopping engine and I pulled over and parked.. [sic] Porsche arranged flatbed to get car to dealer. They told me that this is not an uncommon issue[.]"[14]

- May 6, 2015: "HELP! 2010 Panamera S Coolant blew out engine Temperature high! NEED ADVICE! Hi everyone, I need some serious help… I was driving my 2010 Panamera S V8 around 4-6000RPM for about 5-10 mins and I saw the engine temp went pass the middle line. Soon later I smelled coolant from the inside. Following messages were immediately displayed: "check coolant Level", "Engine Temperature high", "Temperature sensor failed (something like that)" I then shut down the engine after 1 minute or 2. I opened up the hood and see coolant everywhere in the engine bay, it was even shot out of the hood."[15]

- July 1, 2013: "[T]he coolant on mine did leak out recently, as it has for the original posterior [sic] and a couple of other guys, causing a high engine temperature warning. The thermostat housing appears to be the weakness here. This happened after 45k miles.[16]

- February 1, 2018: "My 2011 S with 83k miles on it had a failure of the glue (Loctite 638/648) that holds an aluminum coolant pipe into the thermostat housing on the front of the engine...BTW, Porsche has a 'fix' for this issue that uses threads instead of glue. Go figure. The cost is $1,800 to have a dealer implement the fix."[17]

- February 2, 2018: "New owner of a 2013 Cayenne GTS. . . Got a call that the 'thermostat pipe' could be moved by hand and should be replaced NOW. Service advisor thought it was around $2800 to do."[18]

---

[13]     https://www.6speedonline.com/forums/panamera/313204-coolant-overheat-blow-out.html (last visited June 12, 2019).

[14]     *Id.*

[15]     https://www.6speedonline.com/forums/panamera/364043-help-2010-panamera-s-coolant-blew-out-engine-temperature-high-need-advice.html (last visited June 12, 2019).

[16]     https://www.6speedonline.com/forums/panamera/274908-2011-panamera-turbo-nightmare-anyone-else-having-issues-model-3.html (last visited June 12, 2019).

[17]     https://rennlist.com/forums/cayenne-958-2011-2018/1045931-2011-2014-v8-serious-issue-coolant-pipe-glue.html (last visited June 12, 2019).

[18]     *Id.*

41.     In addition to the numerous complaints online, Porsche has continued to conduct expensive repairs of the Cooling System Defect through its authorized repair facilities. As discussed below, Porsche also developed a new design that does not rely on adhesive. As a result, Porsche knows or should know that the Cooling System Defect still exists and should have informed Plaintiffs and Class Members of the whole truth.

### *Despite Knowing that the Cooling System Defect Persists, Porsche Refuses to Inform Drivers of the Defect or Recall the Defective Vehicles to Implement Necessary Repairs*

42.     Despite knowledge of the Cooling System Defect and its development of a new, more reliable design of the thermostat housing, Porsche refuses to admit there is an ongoing problem with the Defective Vehicles, refuses to notify purchasers of the Defective Vehicles that use of adhesive on certain slip-fit attachments is prone to sudden failures, refuses to correct its public statements that the problem was fixed, and refuses to recall the Defective Vehicles to conduct the repair. Every new and used Porsche vehicle purportedly undergoes a thorough inspection before it is sold or leased. The results of the inspection are made available to each buyer and lessee. Porsche could have but did not inform Plaintiffs and other Class Members that the adhesive slip-fit design is prone to early failure and that there is an ongoing defect. Instead, Porsche claims any problem was fixed with a manufacturing change and claims ignorance of an ongoing problem, leaving Plaintiffs and the Class Members to pay thousands of dollars in repair costs.

43.     There are alternate, safer designs for attaching coolant pipes to the thermostat housing, including the one Porsche has used in certain Panamera Vehicles. With this alternate design, the coolant pipes have a mounting flange that bolts onto the thermostat housing, as illustrated in the diagram below:



44.     Porsche has not informed drivers of this safer alternative design and refuses to implement it in the Defective Vehicles for free. Instead, Porsche requires owners of the Defective Vehicles to pay thousands of dollars in repairs and continues to represent that its vehicles are safe and of a particular high-end quality.

45.     Porsche is aware the safety and reliability are of primary importance to purchasers of its vehicles, and thus engaged in a long-term consistent advertising and branding campaign, representing that the Defective Vehicles are safe and are of a high-end quality. Porsche represents in the Defective Vehicles owner's manuals that the Defective Vehicles were manufactured with "advanced engineering, rigid quality control and demanding inspections." Additionally, on its website for 2018 Cayennes, Porsche states, "Arrive at your destination more safely, comfortably & efficiently."

46.     Porsche's advertising brochures for the Defective Vehicles also highlight the safety and quality features. For example, in Porsche's brochure for the 2013 Panamera, Porsche represents: "Performance, safety and the environment are a balance – one that Porsche engineering tackled to create a level of environmental responsibility and regard for driving safety that reflects a more balanced view of one's place in the world." Similarly, in Porsche's brochure for the 2014 Cayenne Porsche states: "Another of our principles: high performance should never

00152255

come at the expense of comfort or safety, and this is something we have kept to. Even with a car offering the phenomenal out-put of the Cayenne Turbo." Based on Porsche's advertising and branding of its vehicles, Plaintiffs and other Class members purchased the Defective Vehicles reasonably believing that they were receiving vehicles that were safe and of a particular high-end quality.

47. However, contrary to Porsche's affirmative promises and reasonable consumer expectations, the use of adhesive epoxy on certain slip-fit attachments in the Defective Vehicles' engine coolant system is a design and manufacturing defect, rendering the Defective Vehicles unreliable and unsafe.

### *Fraudulent Concealment Tolling*

48. Fraudulent concealment occurs both through affirmative representations and by omission. Fraud in the omission can occur when the disclosing party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him or her.

49. Throughout the time period relevant to this action, Porsche willfully concealed from and failed to disclose to Plaintiffs and the other Class Members that the Cooling System Defect in the Defective Vehicles is an ongoing problem that has not been fixed. Porsche kept Plaintiffs and other Class Members ignorant of material information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the Cooling System Defect even upon reasonable exercise of diligence.

50. Porsche had a duty to inform Plaintiffs and the other Class Members of the Cooling System Defect because Porsche knew that the cooling system it designed and installed in the Defective Vehicles was in fact defective. In a public report issued by the ODI in 2014, Porsche admitted that as early as 2007 it investigated the same defect in Porsche 911s and found "the cause as inadequate application of the adhesive." However, through the ODI, Porsche publicly claimed that the problem was fixed in January 2008 with introduction of "an automated metering device for application of adhesive on pipe adapters."

51. Porsche knew or should have known through the continued reports of the Cooling System Defect in the Defective Vehicles and its continued repair of the problem at its authorized repair facilities that the problem was not fixed. Porsche had a duty to disclose this material information to Plaintiffs and other Class Members. Porsche did not. When Plaintiffs and other Class Members purchased their Defective Vehicles, they were not informed that, contrary to

Porsche's prior representations, that there was a defect with the cooling system. Additionally, when Plaintiffs and other Class Members brought their Defective Vehicles in to authorized Porsche repair facilities for repair of the Cooling System Defect, Porsche did not inform them that this was in fact the result of a defect. Instead, Porsche treated it as a warranty issue and made Plaintiffs and other Class Members pay for the repairs.

52.     Additionally, Porsche actively concealed the existence of the ongoing Cooling System Defect from Plaintiffs and the other Class Members when directly questioned whether there was a defect in the Defective Vehicles. For example, in May 2018, Plaintiff Shames questioned Porsche regarding the complaints he had viewed online that appeared to suggest that there was a common problem with the cooling systems in the Defective Vehicles. Despite Porsche's knowledge that there is in fact a Cooling System Defect, Porsche failed to inform Plaintiff Shames of that material fact.

53.     Porsche also continues to affirmatively represent in advertising materials, contrary to its own knowledge, that the Defective Vehicles were safe and of a certain quality when in fact Porsche knows that the Defective Vehicles suffer from the Cooling System Defect.

54.     Porsche failed to disclose and concealed, and continues to conceal, material information from Plaintiffs and the other Class Members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

55.     Porsche intended that Plaintiffs and other Class Members would rely on its omissions and misrepresentations regarding the Defective Vehicles. Plaintiffs and the other Class Members did in fact justifiably rely on Porsche to disclose the known Cooling System Defect. Without disclosure, Plaintiffs and the other Class Members could not know that there was a defect and that they had a legal claim to pursue. Instead, because they did not know of the Cooling System Defect, Plaintiffs and other Class Members purchased Defective Vehicles and paid expensive repairs for the Cooling System Defect. Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiffs and the other Class Members have sustained as a result of the Cooling System Defect by virtue of the fraudulent concealment doctrine.

///

///

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

16

## CLASS ACTION ALLEGATIONS

56.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Class defined as:

> All persons who are the current or former owners, purchasers or lessees of the Defective Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and possessions.

57.    Alternatively, Plaintiffs allege a Florida state Class defined as all persons who purchased or leased a Defective Vehicle in Florida.

58.    Excluded from the Class are: (a) Porsche, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Porsche Dealers and Porsche Dealers' officers and directors; (b) Plaintiffs' Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

59.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The Class consists of tens of thousands of people. Therefore, the Class is so numerous that joinder of all members would be impracticable. The sheer number of the Class Members makes joinder of all members impracticable.

61.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

a.    whether the Defective Vehicles are defective;

b.    whether Porsche misrepresented the standard, quality, and characteristics of the Defective Vehicles;

c.    whether Porsche's misrepresentations regarding the standard, quality and characteristics of the Defective Vehicles were likely to mislead reasonable consumers;

---

FIRST AMENDED CLASS ACTION COMPLAINT

17

> d.      whether Porsche's omission that it did not sufficiently attach certain engine coolant system components was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase a vehicle;
>
> e.      whether Plaintiffs and the other Class Members have been damaged and, if so, the extent of such damages; and
>
> f.      whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

62.      Porsche engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

63.      **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, Plaintiffs and the other Class Members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and the other Class Members, and no defense is available to Porsche that is unique to Plaintiffs.

64.      **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs is an adequate representative of the Class because their interests do not conflict with the interests of the other Class Members. Additionally, Plaintiffs have retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

65.      **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Porsche, making it impracticable for the Class Members to individually seek redress for Porsche's wrongful conduct. Even if the Class Members could afford individual litigation, the court system should

not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Florida Stat. §§ 501.201, *et seq.*

66.     Plaintiffs repeat and reallege Paragraphs 1 through 57 as if fully set forth herein.

67.     The purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is "to protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2) (2018). FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

68.     Plaintiffs and the other Class Members are "consumers," as defined by Florida Statute § 501.203(7), who purchased or leased one or more Defective Vehicles.

69.     Porsche was engaged in and committed the acts alleged herein in the course of "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

70.     Porsche has violated the FDUTPA by willfully and deliberately engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

71.     In the course of conducting business, Porsche intentionally committed unfair and deceptive practices by, among other things, making misrepresentations and omissions of material fact that the Defective Vehicles are safe, and omitting the material fact that it manufactured and sold the Defective Vehicles with a uniform safety defect.

72.     The facts concealed or not disclosed by Porsche to Plaintiffs and the other Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Defective Vehicle or pay a lesser price. Had Plaintiffs and the other Class Members known Porsche used a defective slip-fit design in certain

components of the Defective Vehicles' engine coolant system that were prone to early failure, they would not have purchased or leased the Defective Vehicles, or would have paid less for them.

73.    Plaintiffs and the other Class Members were injured and incurred actual damages as a result of Porsche's conduct in that they relied on Porsche's representations and as a result: purchased or leased the Defective Vehicles that used an unsafe and malfunctioning means of adjoining critical engine coolant system components; overpaid for the Defective Vehicles and did not receive the benefit of their bargain; paid out of pocket to repair the defect, which was known to Porsche; suffered an untimely and accelerated diminution in value of the Defective Vehicles; and suffered other injuries proximately caused by Porsche's misconduct as alleged herein. These injuries are the direct and proximate consequence of Porsche's misconduct and violation of Fla. Stat. § 501.201.

74.    Pursuant to Fla. Stat. §§ 501.211(1) and (2), Plaintiffs seek an order for restitution, disgorgement, and damages. Additionally, pursuant to Fla. Stat. § 501.2105, Plaintiffs make claims for damages, attorneys' fees and costs.

## COUNT II
### Declaratory Relief

75.    Plaintiffs repeat and reallege Paragraphs 1 through 78, as if fully set forth herein.

76.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

77.    Porsche marketed, distributed, and sold the Defective Vehicles with a defect in the engine cooling system that is prone to complete malfunction on account of Porsche's failure to properly adjoin the defective components.

78.    Accordingly, Plaintiffs seek entry of the following declarations: all Defective Vehicles contain a design defect in the engine coolant system; (2) all persons who purchased the Defective Vehicles are to be provided the best practicable notice of the defect, which cost shall be borne by Porsche; and (3) Porsche must establish an inspection and repair program and protocol, and notify the Class Members of such program and protocol, pursuant to which Porsche, including its authorized representatives, will repair and replace all necessary parts of the

---

FIRST AMENDED CLASS ACTION COMPLAINT

00152255

engine coolant systems in the Class Members' Defective Vehicles, and at no cost to the Class Members.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class Members, respectfully request that the Court enter an Order:

a.   certifying the Class under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as requested herein;

b.   appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel;

c.   finding that Porsche engaged in the unlawful conduct as alleged herein;

d.   awarding Plaintiffs and the other Class Members damages;

e.   awarding Plaintiffs and the other Class Members restitution and disgorgement of monies Porsche acquired through its violations of the law;

f.   awarding Plaintiffs and the other Class Members declaratory and injunctive relief, including requiring Porsche to repair or replace the Defective Vehicles' engine coolant system components and inform purchasers and leasees of the defect;

g.   awarding Plaintiffs and the other Class Members pre-judgment and post-judgment interest on all amounts awarded;

h.   awarding Plaintiffs and the other Class Members reasonable attorneys' fees, costs, and expenses; and

i.   granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Class Action Complaint so triable.

Respectfully submitted,

Dated: June 12, 2019

_s/ T. Michael Morgan_

T. Michael Morgan (FSB 0062229)
Andrew P. Felix (FSB 685607)
**MORGAN & MORGAN, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
Tel: (407) 420-1414 / Fax: (407) 641-5846
mmorgan@forthepeople.com
_afelix@forthepeople.com_

---

FIRST AMENDED CLASS ACTION COMPLAINT
21

Timothy G. Blood (*pro hac vice*)
Paula R. Brown (*pro hac vice*)
Aleksandr J. Yarmolinets (CA276707)
**BLOOD HURST & O'REARDON, LLP**
501 West Broadway, Suite 1490
San Diego, California 92101
Tel: (619) 338-1100 / Fax: (619) 338-1101
*tblood@bholaw.com*
*pbrown@bholaw.com*
*ayarmolinets@bholaw.com*

Ray P. Boucher (CA115364)
Maria L. Weitz (CA268100)
**BOUCHER LLP**
26100 Oxnard Street, Suite 600
Woodland Hills, California 91367
Tel: (818) 340-5400 / Fax: (818) 340-5401
*ray@boucher.la*
*weitz@boucher.la*

*Attorneys for Plaintiffs*

00152255

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 12, 2019, I electronically filed the foregoing **First Amended Class Action Complaint** with the Clerk of the Court using the CM/ECF filing system, which effected service on the following counsel of record for Defendant Porsche Cars North America, Inc.

| | |
|---|---|
| DLA PIPER LLP (US)<br>Frederick H.L. McClure (FL 147354)<br>J. Trumon Phillips (FL 84568)<br>200 South Biscayne Boulevard<br>Miami, FL  33131-5341<br>Tel: 813/222-5908<br>813/371-1111 (fax)<br>frederick.mcclure@dlapiper.com<br>trumon.phillips@dlapiper.com | DLA PIPER LLP (US)<br>William F. Kiniry, Jr. (*pro hac vice*)<br>Matthew A. Goldberg (*pro hac vice*)<br>One Liberty Place<br>1650 Market Street, Suite 5000<br>Philadelphia, PA  19103-7300<br>Tel: 215/656-3300<br>215/656-3301 (fax)<br>william.kiniry@dlapiper.com<br>matthew.goldberg@dlapiper.com |

*s/ T. Michael Morgan*
T. Michael Morgan

Civil Case No. 1:18-cv-24988-FAM

00152255